The UNITED STATES of America for the Use and Benefit of GENERAL ELECTRIC COMPANY

v.

SOUTHERN CONSTRUCTION COMPANY, Inc., Continental Casualty Company, Mojave Electric Company, Inc., Irving Sulmeyer, Trustee in Bankruptcy for Mojave Electric Co., Inc., National Union Indemnity Insurance Company.

Civ. A. No. 8186.

United States District Court
W. D. Louisiana,
Shreveport Division.

May 8, 1964.

Michael H. Bagot, Jesse S. Guillot, New Orleans, La., for plaintiff.

A Morgan Brian, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

BEN C. DAWKINS, JR., Chief Judge.

This action is brought for the use and benefit of plaintiff, General Electric Company (GE), who furnished supplies for construction of the Barksdale Air Force Base Defense Area's Nike-Hercules Facilities at Bellevue, Louisiana.

GE executed a contract with a subcontractor, Mojave Electric Company, Inc. (Mojave), but had no contractual relationship with the general contractor. Nevertheless, the Miller Act, 40 U.S.C. § 270a et seq., conferred upon the subcontractor's materialmen a cause of action on the payment bond required to be given by the general contractor to the Government. It is upon this bond that GE's action against the general contractor, Southern Construction Company, Inc., (Southern), and its surety, Continental Casualty Co. (Continental), is based.

A joint stipulation of facts has been submitted by the plaintiff and all defend-

ants except the subcontractor, Mojave, which is bankrupt and has not contested the validity of plaintiff's claim against it. The case is submitted on cross motions for summary judgment based upon the pleadings, affidavits, and stipulated facts.

For the reasons here assigned, we conclude that plaintiff has no right of action against Southern and its surety, Continental, or the subcontractor's surety, National Union Indemnity Insurance Company (Indemnity). It is stipulated that National Union Insurance Companies and National Union Fire Insurance Company were not sureties of the subcontractor and had nothing to do with the job involved.

Section 270b(b) of Title 40 U.S.C. provides:

"Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit, but no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by him. The United States shall not be liable for the payment of any costs or expenses of any such suit."

■ Commencement of an action within the time limitation stated under §§ 270a–270d of 40 U.S.C. is a condition precedent to an action by a materialman seeking recovery under the Miller Act. United States For the Use of Soda v. Montgomery, 253 F.2d 509 (3 Cir. 1958). Plaintiff filed this suit on March 13, 1961. The only material supplied to Mojave Electric Company for this job on or after March 13, 1960, was that item listed on GE's account as Register No. 7598–5010–B (hereinafter called # 5010).

■ In connection with item #5010, the stipulation provided:

"Following MOJAVE's default and abandonment of its subcontract work, SOUTHERN and GE negotiated an arrangement whereby SOUTHERN would pick-up and re-order on its own purchase orders all materials which MOJAVE had already ordered but which had not yet been delivered and billed by GE, or necessary materials not yet even ordered by MOJAVE, and GE would sell and invoice these on open account directly to SOUTHERN. Written confirmation of this arrangement was made by SOUTHERN's March 25, 1960 letter to GE, typed by GE on its own stationery in its own office where SOUTHERN signed it * * *.

\*         \*         \*         \*         \*         \*

"However, on April 12, 1960, SOUTHERN entered with now-dismissed defendant EVANS-JONES ELECTRIC, INC. (hereinafter called 'EVANS') into a new subcontract, for completion of MOJAVE's abandoned work, which *inter alia* provided in pertinent part as follows:

" 'ARTICLE I. Scope of the Work. Evans-Jones shall take and complete the sub-contract (of Mojave) * * * and shall furnish all the materials * * * required thereunder * * *.

" 'Evans-Jones shall have no liability for payment of any claim for * * * materials incurred by Mojave * * * on account of that part of the sub-contract already done by it, *except that Evans-Jones shall pay for all materials which have been ordered, or which are now being processed, or which are now in transit, and specifically the following items:*

\*         \*         \*         \*         \*         \*

" 'General Electric Invoice No. 7598–5010B dated March 14, 1960 covering 6 cast iron boxes only per drawing 8332–DT and 6 cast iron boxes only per drawing 8333–DT and 12 covers, gaskets, and screws*

*for boxes in amount of $1,977.74.'*
(emphasis added)

\* \* \* \* \* \*

"Said completion subcontract was separately bonded for $104,000 to SOUTHERN by EVANS with The Travelers Indemnity Company as surety on that bond \* \* \*.

\* \* \* \* \* \*

"On April 13, 1960, SOUTHERN notified GE of the take-over by EVANS, that part of the previous order-pick-up arrangement by SOUTHERN was superceded [*sic*] by EVANS' new order-pick-up agreement as specified in said completion subcontract, and that GE should commence selling and invoicing such orders directly to EVANS on its own separate open account. \* \* \*

\* \* \* \* \* \*

"GE consented to this and wrote EVANS on April 18, 1960, confirming that invoice #5010 in the amount of $1,977.74 was being shifted from MOJAVE's account to a new account with EVANS. \* \* \*

\* \* \* \* \* \*

"Subsequently, GE actually did transfer invoice #5010 to its new account with EVANS \* \* \*.

\* \* \* \* \* \*

"On May 31, 1950, EVANS paid GE in full for invoice #5010 \* \*.'"

Since the action against Southern and Continental was not brought within a year after supplying the last material *for which claim is made*, it must be dismissed.\*

■ Even though plaintiff forfeited its rights against the prime contractor by failure to bring suit within the time required by statute, it is possible that a claim still existed against the subcontractor and its surety upon the conventional payment and performance bond which Southern required Mojave to furnish. The bond provided in pertinent part as follows:

"\* \* \* MOJAVE ELECTRIC COMPANY, as Principal, and NATIONAL UNION INDEMNITY COMPANY, as Surety, are held and firmly bound unto SOUTHERN CONSTRUCTION CO., INC., Augusta, Georgia, in the sum of ONE HUNDRED SEVENTEEN THOUSAND, SEVEN HUNDRED AND SEVENTY SIX AND NO/100 DOLLARS ($117,776.00), for the payment of which sum, well and truly to be made, we bind ourselves, our heirs, executors, administrators and successors, jointly and severally, firmly by these presents.

"The condition of this obligation is such that whereas the Principal has entered into a certain subcontract, hereto attached, with Southern Construction Company, Inc., dated SEPTEMBER 22, 1959.

"Now, if the said Principal shall well and truly perform all of the work and furnish all the labor and materials required by said subcontract, and any changes or additions thereto which may hereafter be made, and shall perform all the undertakings stipulated in said subcontract, and shall promptly make payment to all persons supplying labor and materials in the prosecution of the work provided for in said subcontract, then this obligation to be void; otherwise to remain in full force and effect.

"No extension of time given to the said Principal for the performance of said subcontract, and no change in said subcontract shall release the Surety hereon."

In researching the jurisprudence for cases involving interpretation of a similar agreement, we find that this is one of those rare instances in which there exists an appellate decision of a case which is almost on "all fours" with this one; namely, Socony-Vacuum Oil Co. v. Continental Casualty Co., 219 F.2d 645 (2 Cir. 1955). There the court noted

\* See Appendix, in which defendant's counsel very ably has analyzed 40 U.S.C. § 270b.

that state law controls interpretation of a conventional suretyship agreement. It applied Vermont law and concluded that since the prime contractor had required the subcontractor to obtain a payment bond conditioned upon the payment of all laborers and materialmen, the bond provided protection for them. The court criticized the decision in McGrath v. American Surety Co. of New York, 307 N.Y. 552, 122 N.E.2d 906 (1954), in which it was held that a materialman had no right of action against a surety of a subcontractor under a similar private bond.

The Socony-Vacuum decision reached an equitable result, which we would be inclined to follow but for the fact that Louisiana courts have adopted a position similar to that pronounced in McGrath. In Louisiana only the named obligees on such conventional contractor's bonds, not third party materialmen, may recover from the surety on the bonds. Carolina Portland Cement Co. v. Carey & Boettner, 145 La. 773, 82 So. 887 (1919); State v. C. S. Jackson & Co., 137 La. 931, 69 So. 751 (1915); Lhote Lumber Mfg. Co. v.Dugue, 115 La. 669, 39 So. 803 (1905); Hughes v. Smith, 114 La. 297, 38 So. 175 (1905); and Salmen Brick & Lumber Co. v. LeSassier, 106 La. 389, 31 So. 7 (1901).

Although the correctness of the Louisiana position under modern civil law theory has been questioned, Smith, Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui, 11 Tul.Law Rev. 18, 35–47 (1936), unless and until the Louisiana Supreme Court alters its position, we are bound to follow it. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, the action against Southern, Continental and Indemnity will be dismissed.

A proper decree shall be presented.

### APPENDIX

From Defendants' Memorandum Brief of July 30, 1963, pp. 8–15:

"That part of the Miller Act applicable to a materialman's action against prime and surety on the statutory payment bond is found in 40 USC § 270b, and consists of two subparts of its own, (a) and (b), stating in pertinent part as follows:

" '(a) * * * every person who has furnished * * * material * * * who has not been paid in full therefor before the expiration of a period of 90 days after the day on which the last of the * * * material was furnished or supplied by him *for which such claim is made,* shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute their action to final execution and judgment for the sum or sums justly due him; provided, however, that any * * * (remote materialman) * * * shall have a right of action upon giving written notice to said contractor within 90 days from the date on which such person * * * furnished or supplied the last of the material *for which such claim is made* * * *.

" '(b) * * * Every suit instituted under this section shall be brought * * * in the United States District Court * * * but no such suit shall be commenced after the expiration of *one year after the day on which the last of the* * * * *material was supplied by him.* * * ' (Emphasis added)

"The foregoing (current) version of this part of the Miller Act results from the Act's latest amendment which was enacted by the 86th Congress as Public Law 135 (73 Stat. 279). That amendment became effective on August 4, 1959, and is expressly applicable to all federal construction jobs covered by prime contracts dated thereafter. Since SOUTHERN's prime contract with the Government for the job here is dated August 6, 1959, two days after the amendment's effective date, the foregoing amended version of the Act (rather than the pre-amendment version) applies to the prescriptive issue now presented here at bar.

"It is highly significant that the 1959 amendment changed only subpart (b), not subpart (a).

"The '(a)' subpart for some time had referred to the same two separate and distinct 90-day periods which are preserved in the foregoing amended version. They were not altered in the least by the 1959 amendment. The first of such 90-day periods specifically covers the question of filing and 'prematurity' of a Miller Act bond suit; i. e., such suit cannot be filed by an unpaid materialman sooner than or until 90 days after the time when the last of the particular materials *'for which (his) claim is made'* were furnished. The other 90-day period treats the matter of the prerequisite 'notice of claim' which remote materialmen must give in order to preserve their entitlement to sue on a Miller Act bond; i. e., such suit cannot be filed by a sub's (as distinguished from the prime's) materialman unless he has already sent a registered-letter-notice-of-claim to the prime during that same period of 90 days after the time when the last of the particular materials *'for which (his) claim is made'* were furnished. Thus, both before and after the 1959 amendment, both of the 90-day periods of time referred to in subpart (a) commenced to run on exactly the same date, viz., the date of the claimant-materialman's last furnishing of the particular materials for which his suit-claim is made.

"Only the '(b)' subpart was changed by the amendment. It had always provided a 1-year prescriptive period within which materialmen's suits on Miller Act bonds must be brought. And it still does. The change wrought by the amendment occurred only in the language specifying when such 1-year period commences to run. Before the amendment, this subpart (b) provided that the year began right after the 'date of final settlement of the prime contract as certified by the Comptroller General'. This was an entirely different starting time than applied to the two 90-day periods in the pre-amendment subpart (a). But the 1959 amendment changed that 'date of final settlement' language in subpart (b) so as to provide that the 1-year suit-filing limitation would—like the unchanged 90-day periods in subpart (a)—begin to run 'after the day on which the last of the material was supplied by him' (i. e., the materialman making the claim in suit).

"Accordingly, it is evident that the amendment's only purpose was to make commencement of all the prescriptive periods in the Act uniform. Prior to 1959, the Miller Act's 90-day pre-suit-filing and 90-day notice-of-claim periods in subpart (a) both began to run from 'date of last furnishing for which claim is made', while the 1-year suit-filing limitation in subpart (b) started running from the entirely different 'date of final settlement of the contract'. But the amendment eliminated that disparity of commencement times between the two subparts. It left subpart (a) as it was, continuing to initiate the two 90-day periods from 'date of last furnishing for which claim is made'; whereas, subpart (b) was radically changed, deleting all reference to 'final settlement of the contract', and having the 1-year period run instead from 'date of last furnishing'.

"It is therefore not really important that the new criterion of amended subpart (b), i. e., 'date of last furnishing', seems to be less restrictive than the older phrase still used throughout subpart (a), viz., 'date of last furnishing *for which claim is made*'. For clearly, the new and changed language of subpart (b) must be read and interpreted in *pari materia* with the long-established and unaltered expressions which Congress allowed to stand intact in subpart (a). These two subparts are closely related in their contexts. Both are portions of but a single section of the Act, § 270(b), all of which treats the sole subject of filing furnishers' suits against primes and sureties on statutory payment bonds. All three of the prescriptive limitations mentioned in § 270(b), two 90-day periods and one 1-year period, have to do with filing such suits. Hence, although the exact existing words were not used in the 1959

amendment, it is implicit in the overall context of the section that the new language in subpart (b) means 'date of last furnishing *for which claim is made*' just as has always been true of subpart (a).

"It would be completely unrealistic to assume that Congress intended its new 1959 standard, 'date of last furnishing', to mean something quite different from the retained pre-amendment concept, 'date of last furnishing *for which claim is made*'. This would be tantamount to saying that, although Congress intended for its amendment to correct the previous disparity of starting times between the section's two subparts, it foolishly failed to accomplish that result because the nonconforming criterion was replaced with a new standard which is just as incongruous as the original maverick which had caused the disparity in the first place.

"That Congress intended no such self-cancelling action is vividly shown in the legislative history of its 1959 amendment to the Miller Act. See 2 U.S.Code Congressional & Administrative News (1959), at pp. 1995–2000, which includes the Senate Judiciary Committee's favorable report on the bill, urging its passage by Congress, and a supporting opinion from the Comptroller General.

"The Senate Judiciary Committee's report characterized the proposed amendment as one designed 'to eliminate all responsibility of the Government for fixing dates on which the period of limitation for filing suits against Miller Act payment bonds commences to run' (p. 1995). Its 'purpose' is stated succinctly as being merely 'to relieve the Comptroller General of the responsibility for fixing the date on which the statute of limitations commences to run in certain suits under the Miller Act' (p. 1995). In pertinent part, the Committee's report says:

"'This proposed legislation has been recommended to Congress by the Comptroller General * * *. It deals with an administrative problem that has arisen under the Miller Act * * * which establishes performance and payment bonding requirements for most Federal construction contracts. Under present law a person who has not been paid in full for * * * material within 90 days after the last * * * material (was) furnished may sue on the payment bond. The time within which a suit may be instituted against the contractor under the payment bond requirements for * * * material supplied will be changed from the present statutory requirement of one year after the "date of final settlement of such contract" as certified by the Comptroller General to one year after the "day on which the last of the * * * material (was) supplied by him." (p. 1995)

* * * * * *

"'The determination of the date of final settlement has involved an ever-increasing administrative burden on the Comptroller General. It has further been complicated by court decisions that have liberally construed the term "labor and material". In applying the criteria the determination is often reached without knowledge or agreement on the part of the contractor.

"'The change in the law recommended by the Comptroller General will place every * * * supplier of materials on an equal basis. Those supplying * * * material in the first stage of the contract will be subject to the same 1-year period within which to institute suit as those * * * supplying materials in the last stages of the contract. The supplier * * * would also know simply by consulting his records the precise time when the one limitation began to run and (by adding one year) when his right to sue would expire.

* * * * * *

"'The proposed change in the law would result in material savings to the Government when the expenses

of the Comptroller General and those agencies having charge of the contract are taken into consideration.

" 'The Committee feels that the proposed legislation is most meritorious. It will not only result in savings in administrative costs to the agencies, but it will also provide for those entitled to sue under payment bond requirements of the Miller Act a simple, fixed, and certain method for determining the period within which the suit must be filed. It is, therefore, recommended that the bill be favorably considered.' (p. 1996)

"And, significantly, the Comptroller General's opinion supporting adoption of the amendment points out that:

" 'Amendment of the Miller Act in this fashion would eliminate all responsibility of the Government for fixing the date at which the period of limitation commences to run. At the same time, no difficulties would be placed in the way of claimants under the payment bonds, since they already are required to establish *identical dates* in connection with accrual of their rights to sue. In fact, they undoubtedly will benefit from the elimination of effort and concern in establishing "final settlement" dates.' (p. 1999, emphasis added)

"From the foregoing, and especially the reference to *'identical dates'*, it is obvious that the intent of both Congress and those who sponsored and pushed through the 1959 amendment was to have the date on which the 1-year period in subpart (b) commences to run changed so as thereafter to be *identical* to the already-established common date on which both 90-day periods in subpart (a) had all along been commencing to run. And that uniform starting date was then and still is 'the date of last furnishing of materials for which claim is made' !

"So, notwithstanding Congress' failure, in amending subpart (b), to repeat for a third time in the same short section the qualifying words 'for which claim is made', which if done would have been a burdensome redundancy, the legislative history of this amendment shows that Congress fully intended for its new language in subpart (b) to be understood as meaning exactly that, just as its previous language in subpart (a) expressly says in two separate places. Congress merely used in (b) a shortened version of the same phrase stated in its fullest details in (a).

"Exhaustive research has revealed no cases construing this point, nor even generally interpreting the phrase 'for which claim is made' as used in either the (a) or (b) subparts, either before or after the amendment. It appears to be an issue of first impression in the instant matter, with no guiding precedent available for the Court's assistance. But the legislative intent is strongly shown to favor moving defendants' position that Section 270(b) (b) of the Miller Act, as amended in 1959, requires that a materialman's suit against the prime and surety on the statutory payment bond must be filed within one year after the date on which that same materialman last furnished the particular materials for which he is claiming payment in the suit so filed. This Court should so hold. Cf: US for Weithman vs Buckeye Union Cas. Co.*

"*A fortiori*, any portion of the materials originally so furnished but subsequently paid for in full cannot possibly—after such payment and much later at the time of filing suit—be considered part of the particular materials for which claim is then (i. e., in the suit) being made. This Court should so hold on that point also.

* "207 FS 552 (ND Ohio-1962), construing the amended subpart (b) narrowly and holding that materials furnished by someone else cannot establish the date of last furnishing by the particular supplier whose suit must be filed within one year of his own last furnishing, even though the other party's furnishing was for that supplier's benefit.

880

"When the foregoing legal principles compelled by the governing statute are applied to the undisputed facts of this case, it is readily apparent that GE's suit at bar was filed too late. It was not filed within one year of the date on which GE last furnished the particular materials for which it seeks payment herein, or, in the applicable language of the statute, 'for which claim is made' by GE."