C. E. RUSSELL, d/b/a Russell General Tire Service and the United States of America for the Use and Benefit of C. E. Russell, d/b/a Russell General Tire Service, Plaintiff,

v.

The TRAVELERS INDEMNITY COMPANY

and

S. S. Silberblatt, Inc., Defendants.

SINCLAIR REFINING COMPANY, and the United States of America for the Use and Benefit of Sinclair Refining Company, Plaintiff,

v.

The TRAVELERS INDEMNITY COMPANY

and

S. S. Silberblatt, Inc., Defendants.

Nos. 1877, 1937.

United States District Court
W. D. Missouri, S. D.

Aug. 4, 1965.

Cohn & Lentz, Waynesville, Mo., for plaintiffs.

F. L. Kenney, Jr., St. Louis, Mo., for S. S. Silberblatt, Inc.

Bernard A. Reinert, St. Louis, Mo., Rafter & Biersmith, Kansas City, Mo., E. C. Curtis, Springfield, Mo., for Travelers Indemnity Co.

JOHN W. OLIVER, District Judge.

Our memorandum opinion reported in Fine v. Travelers Indemnity Co., W.D. Mo.1964, 233 F.Supp. 672, was applicable to five of the consolidated Fort Leonard Wood Capehart cases (Nos. 1852, 1877, 1901, 1937, 1945 and 1954). We there decided the common issue of law relating to the tier of contractual relationship involved in all five cases.

Utilization of Rule 42(b) of the Rules of Civil Procedure permitted the segregation and determination of that separated issue. Further utilization of that rule now permits the final determination of two of the five cases in that particular consolidated group.

Pursuant to further pre-trial direction, and by stipulation of the parties, this memorandum opinion will determine (a) whether, in No. 1877, defendants are obligated to pay the $2,470.95, plus interest, claim of Russell General Tire Service, and (b) whether, in No. 1937,

defendants are obligated to pay the $2,-066.55, plus interest, claim of Sinclair Refining Company. Questions of notice are involved in both cases; additional questions are involved in Russell, No. 1877.

### I. *Russell Claim, No. 1877*

In No. 1877 the parties stipulated that Russell's claim "is for materials furnished and labor performed in supplying tires, tubes and other material and the repairing and servicing the equipment of W. S. Conner in the prosecution of the Silberblatt contract at Fort Leonard Wood, Missouri, as set out on the Russell invoices * * * attached hereto as Exhibits 1 through 15." Those exhibits reflect material deliveries or services rendered to Silberblatt job (or project) No. 637 between April 21, 1961 and May 3, 1961. The total of $2,470.95 is reflected both on the ledger of Russell and on the ledger of Conner.

On July 17, 1961, Russell wrote the following letter, copies of which were sent by registered mail both to Conner and Silberblatt:

Mr. Lloyd Stavers,
Resident Engineer,
P. O. Box 6
Fort Leonard Wood, Mo.

Re: W. S. Conners Construction Co., and 800 Capehart Housing Units Contract #DA–23–028–Eng. 4529

Dear Sir:

I wish to call your attention to the account referred to above: W. S. Conners Construction Company.

On April 18, 1961, we presented to Mr. Tom Geary, with a copy to the S. S. Silberblatt office, a Tire Sales & Service proposal which was accepted by Mr. Tom Geary. We started doing business with this account on April 21, 1961. We received purchase orders from this account substantiating the invoices for the labor and material delivered according to the agreed proposal.

Within the proposal structure we definetly (sic) set forth payment terms of this proposal. In attempting to collect according to the terms outlined in the proposal, I was told that the bills would be paid on a 30 day basis. We have now waited a period of 60 days and we have not received compensation for the labor and material delivered. I forwarded to both the W. S. Conners Construction Company, and to the S. S. Silberblatt Company, copies of the invoices for this labor and material. This was done about 30 days ago. The amount due and payable at this time is $2,470.95. The copy of this letter to the prime contractor, S. S. Silberblatt, is asking that this amount be paid in full at this time.

I am forwarding to you copies of the statement. Thanking you very much for your attention to this matter.

Yours very truly,
RUSSELL GENERAL TIRE
SERVICE

CER/pr
CC. W. S. Conners Constr. Co.
S. S. Silverblatt

S. S. Silverblatt Co. this is a request for payment in full as per the attached statement for $2,470.95.

An itemized statement for $2,470.95 was forwarded with the original and copies of that letter. The return registered mail receipt evidenced delivery to Silberblatt on July 17, 1961.

The following registered mail letter from Russell was received by Travelers in Hartford, Connecticut, on August 11, 1961, and by Travelers' office in St. Louis on August 9, 1961:

The Travelers Indemnity
Insurance Co.
Hartford, Connecticut

Gentlemen:

We are herewith advising that W. S. Conners Construction Company as subcontractor of S. S. Silberblatt, Inc. under contract DA–23–028–

Eng–4529 is in arrears in payment of $2,470.95 for material and labor supplied in construction of Capehart Housing units at Fort Leonard Wood, Missouri.

We are taking this means of notifying you of this delinquent account, and we are sending a carbon copy of this letter to your St. Louis office.

Yours very truly,

RUSSELL GENERAL TIRE SERVICE

C. E. Russell

CER/b

cc: Travelers Indemnity Co.
4th & Pine (Pierce Bldg.)
St. Louis, Mo.
Attn: M. C. Borders

Those notice letters must be read in light of two conditions in the Capehart bond. Those two conditions are the same two conditions set forth and construed in Continental Casualty Co. v. Allsop Lumber Co., 8 Cir. 1964, 336 F.2d 445, cert. denied 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561. The Conditions 2 and 4 are set forth in footnote 2 on page 448 of Allsop Lumber and read as follows:

2. The above named Principal and Surety hereby jointly and severally agree * * * that every claimant * * * who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's * * * materials were furnished by such claimant or before the expiration of the period provided by the law of the place where the project is located for the giving of first notice of a lien of the category claimed by defendant, whichever period be longer, may sue on this bond * * *.

* * * * * *

4. No suit or action shall be commenced hereunder by any claimant:

(a) Unless claimant shall have given written notice to any two of the following: The Principal, any one of the Obligees or the Surety above named, before the expiration of the period referred to in condition 2 above, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail, * * * or served in any manner in which legal process may be served in the place in which the aforesaid project is located, save that such service need not be made by a public officer. For the purpose of this condition 4(a), either the giving of notice, or the filing of lien, in accordance with the pertinent lien law of the place where the project is located is a sufficient notice hereunder.

Defendants contend that "sending a copy of the letter of July 17th * * * to Silberblatt, Inc., and then subsequently about August 9th, sending another letter to the Travelers, did not comply with the dual notice requirement of the bond."

In argument, defendants quote that portion of Allsop Lumber (page 451 of 336 F.2d) which commented that it had been held in Continental Casualty Co. v. United States for the Use and Benefit of Robertson Lumber Co., 8 Cir. 1962, 305 F.2d 794, cert. denied 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231, that the dual notice provisions of a Capehart bond, "which were *more stringent* than those of the Miller Act," had to be met in in order to bind the surety in an action on a Capehart bond.

That portion of the Allsop Lumber was quoted in support of the argument that "if the notice provisions of the Capehart bond are *more stringent* than those of the Miller Act * * * then notices of the kind the plaintiff (Russell) served in this case are not proper compliances with the bond." Defendants add that "relaxing the literal requirements of the Capehart bond to the point where the notice is actually a Miller Act notice, is

not in keeping with the stated intent of the Eighth Circuit."

Defendants' argument is not tenable for two reasons. First, Robertson Lumber did not hold that the dual notice provisions were applicable because they were more "stringent". There can be no doubt that the Capehart bonds' notice provisions are more "stringent;" but that fact did not play any part in the rationale of the Eighth Circuit when it decided Robertson Lumber. See the discussion and evaluation of the rationale of Robertson Lumber in the Note entitled "Surety bonding in the construction of military housing under the Capehart Act," 50 Iowa L.Rev. (1965) 1217 at 1225 and 1234, respectively.

The sophistry of defendants' semantic argument is exposed by noting that Judge Blackmun stated in Allsop Lumber that "Robertson stands for what it holds, namely, that the notice provisions of a Capehart bond prevail over the *less* stringent" notice provisions in the Miller Act (336 F.2d at 452). It is quite apparent, at least to us, that whether the Eighth Circuit speaks in terms of the Capehart bond notice provisions as being "*more* stringent than those of the Miller Act" (336 F.2d at 451) or whether it reiterates that Capehart bond notice provisions shall "prevail over the *less* stringent" notice provisions in the Miller Act" (336 F.2d at 452), it has, in both instances, merely used the word "stringent" as a convenient descriptive word and that in neither instance did it declare any "stated intent" that the Capehart bond notice provisions should be harshly applied to relieve a compensated surety of its contractual obligations.

Indeed, we are inclined to believe that our controlling court's refusal in Allsop Lumber (reiterated most recently in Missouri-Illinois Tractor & Equipment Co. v. D & L Const. Co., 8 Cir. 1964, 337 F.2d 507 at 509) "to introduce further complications into an already too complicated area by the development of technical niceties of distinction between procedural and jurisdictional and substantive aspects" (336 F.2d at 452), indicates

that it is of the present judgment that its decision in Robertson Lumber was, to say the least, harsh enough and that it will not create any additional defenses to actions on Capehart bonds that are not equally available in actions on Miller Act bonds.

Be all that as it may, this branch of defendants' argument is untenable for a second reason. The bond provision merely requires that any two of the Principal, any one of the Obligees, or the Surety be "given [a] written notice [which states] with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished or for whom the work or labor was done or performed."

Certainly the letter of July 17 and the Travelers' letters notified the recipients of those communications that $2,-470.95 was being claimed by Russell for labor and material furnished Conner on the Silberblatt Fort Leonard Wood Capehart job. It is certain that such notices would be valid under the Miller Act. See the almost impatient rejection of an argument not dissimilar to defendants' argument in this case in United States for Use and Benefit of Hopper Bros. Quarries v. Peerless Casualty Company, 8 Cir. 1958, 255 F.2d 137 at 143, cert. denied 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed. 2d 69. See also the other numerous cases collected in the annotation "Sufficiency of notice to public works contractor on United States project under Miller Act", 78 A.L.R.2d 429.

We believe the rule of decision announced in Peerless Casualty Company should be applied to this Capehart case. We read nothing in Robertson Lumber that indicates we should not do so. We so indicated in a much earlier opinion applicable to these two cases when we stated that we would follow the rule of Fleisher Engineering & Const. Co. v. United States for Use and Benefit of Hallenbeck, 311 U.S. 15, 61 S.Ct. 81, 85 L.Ed. 12 (1940) in regard to whether the notices had to be sent by registered mail. See United States, for Use and Benefit of Fine v. Travelers Indem-

nity Company, W.D.Mo.1963, 215 F.Supp. 455 at 466.

We therefore find and hold that the form of the notices were in substantial compliance with the bond conditions.

Defendants also contend in regard to the Russell claim that "the notice given by Russell did not comply with the time requirement of ninety (90) days set out in the bond." Defendants argue that it is "the crux of the defendants' position that the bonds provide: (a) either 'the giving of notice' and when notice is given it must be within ninety days; or (b) the filing of lien, in accordance with 'local lien law,' in which event the four months period controls."

Defendants press their argument to the point of saying that "if the plaintiff elects to proceed under the four month lien period then he must comply with the Missouri lien statutes" and even suggests that "to hold otherwise is to do violence to the intent of the Court [of Appeals] in the Allsop case." We do not agree.

Allsop Lumber, as we read that case, is a controlling determination directly opposed to all counts of defendants' contention and supporting argument. In that case, as in this, the alternative 90 day period had expired before any notice was given. Thereafter, and at different times, notice was given within the four month period within which Missouri lien could have been effected.

The notices were held to be valid in Allsop Lumber because it was apparent that under the Missouri statutes, they were filed within the period of time within which the filing of a lien must be effected, which was held to be a four month period "after the indebtedness shall have accrued." That case further held that:

It is similarly apparent from the bonds that the notice period thereunder is an alternative one, namely, either ninety days after the date the last materials were furnished, or the time specified by the Missouri statutes "for the giving of first notice

of a lien", whichever period is the longer; * * *

Allsop Lumber expressly rejected the same general argument that defendants tender in regard to the alleged necessity of either giving a notice within 90 days or actually completing the Missouri lien procedure within a four month period. After noting that "certainly the bond contemplated the Missouri lien law time period as an alternative," Allsop Lumber held that "notice *and not the technical effectuation of the lien* is what must have been contemplated by the language of the bonds" (336 F.2d at 454, emphasis ours).

■ Both notices having been received by at least two of the required parties before the expiration of the four month period allowed by Missouri law for the effectuation of a lien, we hold that the notice provisions as set forth in the bond were complied with, all in accordance with the express teaching of Allsop Lumber.

Defendants' additional contentions in regard to the Russell claim need be but noticed to be ruled. Allsop Lumber is again controlling. Defendants contend that "the bare fact that tires and tubes and services were furnished to Conner and put on his equipment is immaterial when there is no proof that such * * were in fact, at least indirectly incorporated into the project." Defendants also argue that "there is no presumption * * * that the materials and services sold to W. S. Conner were to be used and consumed on the Silberblatt project."

The Russell invoices and the ledger sheets of both Russell and Conner identify and establish that the material and services were furnished job (or project) 637 of the Silberblatt project. There was no other direct evidence introduced to show actual incorporation of the labor and material supplied. Nor was there any credible evidence to the contrary.

The parties have, however, stipulated that Russell would testify that he had been in business for twenty years; that he knew the type of equipment that Con-

ner was using and the terrain where the equipment was used and the conditions under which it was working; and that, based on his experience and knowledge, he also knew that the materials furnished would be substantially used and consumed in the prosecution of Conner's work.

Although defendants concede that the tires and supplies were used on Conner's equipment, they contend that there is a gap in plaintiff's evidence because "Conner was doing work on a number of other jobs in the area at the same time he was on the Silberblatt project." There is some vague general deposition testimony to the effect that Conner did have jobs other than that identified as job 637 for Silberblatt.

Defendants argue that such testimony commands a factual finding that "the materials were used and consumed [not only on Silberblatt job No. 637 but also] in the prosecution of Conner's [other] work [which] included the D & L job, the Chaney & Hope job, the Dondlinger job, and a number of other jobs in and around Fort Leonard Wood that Conner was working at the same time he was working on the Silberblatt Project." In addition to the deposition testimony, defendants also submitted an affidavit of Silberblatt's administrative officer to the effect that "equipment of W. S. Conner would be used on the S. S. Silberblatt, Inc. job one day and then moved and used on other work not connected in any way with S. S. Silberblatt, Inc., or the Sterling Brukar Company."

Defendants, however, did not make any effort to corroborate this general line of testimony by any contemporaneous documentary evidence but are content to argue that plaintiff's evidence is insufficient to establish its claim and that plaintiff failed to carry its burden of proof.

■ We find and determine from all the facts and circumstances that the burden of going forward with the evidence shifted to defendants when Russell established without dispute that the materials were in fact furnished for Silberblatt job 637.

■ We also find and determine that defendants' evidence concerning Conner's other work was insufficient to shift that burden back on plaintiff; hence, it must be held that defendants can not be said to survive the risk of non-persuasion and that plaintiff's evidence, being accepted by the trier of the facts, is sufficient and must be held to establish its claim. (Our use of the terms "burden of proof", "risk of non-persuasion", and the "burden of going forward with the evidence", is used in generally the same sense as developed and used by Professor Wigmore in Sections 2483 to 2498a of IX Wigmore on Evidence, Third Edition). We so find.

Looking again to Allsop Lumber for the controlling law, we note that defendants there, as defendants here, argued that "Allsop must show *actual* incorporation of the lumber supplied" (336 F.2d at 455, emphasis ours). Judge Blackmun noted that "the record does indicate that Allsop had no actual knowledge that all the lumber it furnished went into the project" (336 F.2d at 455).

But Judge Blackmun held that the defense argument in regard to plaintiff's alleged failure of proof was untenable because the language of the bond "appears to emphasize the furnishing of materials to the project, rather than their incorporation in it."

After directing attention to Robertson Lumber's holding that "Capehart suppliers should have substantial bond protection essentially similar to that afforded Miller Act suppliers" (305 F.2d at 799), Allsop Lumber held:

> It is now settled that any local lien rule requiring proof of actual incorporation into the project is not applicable to a suit on a Miller bond. All that is necessary is that the supplier in good faith reasonably believe that the materials are intended for the project. [Citing many cases].

In summation of the section of Allsop Lumber relating to plaintiff's alleged failure of proof, Judge Blackmun held:

> With these results under the Miller Act so clear, our comments in Robertson, which were noted again in D & L Constr. Co. v. Triangle Elec. Supply Co., supra [8 Cir., 332 F.2d 1009], that Capehart suppliers should have similar substantive bond protection require the conclusions that Allsop was not required to prove the actual incorporation of all the lumber it furnished * * *

Quite apart from our factual determination that defendants failed to carry their burden of going forward with the evidence and our acceptance of plaintiff's proof as offered, we believe that the rationale of Allsop Lumber and of the Miller Act cases upon which that case is based require that we sustain plaintiff's claim on the facts as stipulated and the inferences that must be drawn from those facts as we have drawn them. We so find and determine.

Judgment shall therefore be entered for Russell in the full amount of $2,470.95, plus interest.

## II. *Sinclair Claim—No. 1937*

The controversy in No. 1937 involving Sinclair's claim for $2,066.55 is more narrow.

The parties stipulated as to the authenticity of records which show that Sinclair commenced deliveries of gas, oil, and other petroleum products to Conner for the Silberblatt project 637 at least as early as January 11, 1961 and continued to make deliveries on a very regular, sometimes almost daily, basis throughout the entire year of 1961 up to and including December 11, 1961, the date of Sinclair's last invoice.

Those records also show that only nine payments were made on the account. The first check, No. 5047, dated April 10, 1961, for $1,565.44 (cashed April 11, 1961) paid all invoices for the months of February and March (the $17.08 invoice for January 11, for some unexplained reason, was neither billed nor paid).

Check No. 5145, dated May 15, 1961, for $3,143.35 (cashed May 24, 1961) paid for invoices rendered during the month of April, short approximately $57.18.[1] Check No. 5181, dated June 21, 1961, for $2,308.82 (cashed June 22, 1961) paid for the invoices rendered during the rest of May, 1961, short $41.44.

Conner's books, however, by claiming the unsupported credit of $3,200.32, detailed in footnote 1, purported to show that the June 21 check "paid the account", a notation that was correctly used only in connection with the first check. It is noteworthy, however, that the Conner books reflected that other checks were issued as "payments *on* account", rather than "payments *of* the account".

We suspect that at least part of the reason for the present litigation is somehow related to the unsupported credit entry of $3,200.53 that was made on Conner's books; but, except for pre-litigation historical reasons, that fact (if indeed it is a fact) is quite immaterial to the ultimate determination of the Sinclair claim. The significant fact is that the unpaid balance of Sinclair's running account was actually increasing as time went on and as more material was being furnished the project.

Check No. 5234, dated July 7, 1961 for $3,259.44 (not cashed until July 21, 1961) paid only a portion of the June invoices; Check No. 5281, dated August 8, 1961 for $3,723.91 (cashed August 17, 1961) paid only a portion of the July invoices; Check No. 5352, dated September 7,

---

1. Conner's records showed another credit entry of $3,200.32 as having been made on May 17, 1961. That alleged credit purported to reduce Sinclair's account on Conner's books by that amount. Sinclair's records, however, show that Conner's unpaid invoices at that time actually amounted to $1,230.41 after full credit had been given for the $3,143.35 payment made on May 24, 1961. We reject Conner's alleged credit of $3,200.32 as unsupported by any evidence.

1961 for $4,557.29 (cashed September 12, 1961) paid all but one of the August invoices; Check No. 5402, dated October 6, 1961, for $5,264.94 (cashed October 13, 1961) picked up the remaining August invoice and paid the September, 1961, invoices; Check No. 5472, dated November 14, 1961, for $3,694.57 (cashed November 21, 1961) paid the October invoices; and Check No. 5503, dated December 4, 1961 for $1,423.00 (cashed December 19, 1961) paid a portion of the November and December, 1961, deliveries, leaving a balance owing on the account of $2,066.55.

Of course, the unsupported Conner entry of $3,200.53 of May 17, 1961 threw Conner's books off to the extent that they purported to show that Check No. 5503 for $1,423.00 actually paid the full remaining balance of the Sinclair account and purported to reflect that the only portion of the account that was unpaid was for invoices rendered between November 27, 1961 and December 11, 1961. No one claims that the invoices rendered between those dates were paid by any one.

On March 5, 1962, Sinclair wrote Travelers with copies to Silberblatt, all by registered mail, the following letter:

Travelers Indemnity Company
Hartford,
Connecticut

SUBJECT: Capehart Housing Project
#DA 23–028 ENG 4529
Fort Leonard Wood, Missouri

PRIME CONTRACTOR: S. S. Silberblatt, Inc.

SUB CONTRACTOR: W. S. Conner

FILE: Contractor

Gentlemen:

We wish to file a bond claim for merchandise delivered to W. S. Conner from January 11, 1961 to December 11, 1961 which remains unpaid, totaling $2,066.55   These deliveries were made from our Crocker, Missouri Agency.

We are enclosing herewith an itemized statement of the account. If you desire copies of the delivery invoices, please advise. Your acknowledgment of this claim will be appreciated.

Yours very truly,

R. W. CURRY
Assistant Credit Manager

RWC:M

cc: S. S. Silberblatt, Inc.
25 W. 45th Street
New York 1, New York

Dept. of Army
Corps of Engineers
Federal Bldg., 9th & Walnut
Kansas City, Missouri

F.H.A.
315 N. 7th
St. Louis, Missouri

Sterling Brukar Company
P. O. Box 38
Ft. Leonard Wood, Missouri

W. S. Conner
4610 S. Congress Avenue
Austin, Texas

John Becker, Marketer
Crocker,
Missouri

Resident Engineer
Fort Leonard Wood
Missouri

The itemized statement of five pages set forth in detail the unpaid January 11, 1961 invoice, the six June and fifteen July invoices that were unpaid, the four unpaid November, and the seven unpaid December invoices. After allowance of the credits we have noted above, the sum of $2,066.55 was shown to be still due and owing.

The correspondence between the parties shows that Travelers advised Sinclair in March that it was "confident that [Sinclair] will hear shortly from our principal or our local representative" ; that in April, however, Travelers advised Sinclair that "your bills to Conner may have no qualification against S. S. Silberblatt or his bond" because "Silberblatt was a general contractor, Sterling Brukar a subcontractor, and W. S. Conner a subcontractor of Sterling Brukar"; that in June, 1962, Silberblatt requested and was furnished copies of all the invoices; that on September 4, 1962, Silberblatt advised Sinclair that "W. S. Conner has never been a subcontractor of the S. S. Silberblatt Company" and suggested that Sinclair "contact the W. S. Conner Company direct".[2]

Defendants' original theory of defense, apart from their effort to insert Sterling Brukar as an alleged subcontractor into the tier of contractual relationships, was based on the factual theory that "the invoices of the plaintiff show that there was a lapse of time from July 28, 1961 to November 27 (123 days) during which no diesel fuel or gasoline was sold by J. F. Becker, the Sinclair station owner, to W. S. Conner; * * *". (See Exhibit 18, which was a response filed by defendants on September 15, 1964, to our pretrial direction for defendants to state their defenses.)

Of course, the invoices of Sinclair show no such thing. They show that between the date of July 28, 1961 and November 27, 1961 Sinclair made a total of eighty-three sales consisting of one additional sale in July, twenty-six in August, twenty-three in September, twenty-three in October, and ten in November.

Defendants, in their recently filed brief, are still attached to the July 28, 1961 date. Defendants now contend that:

The suit is not timely brought because notice was not given within ninety days after July 28, 1961.

The July 28, 1961 date is significant because the plaintiff is making claims for invoices for gasoline, oil and other petroleum products sold to W. S. Conner from January 11, 1961 through July 28, 1961, and then after a lapse of more than one hundred twenty three days for materials sold to Conner for the period November 27, 1961 to December 11, 1961.

Defendants also contend that "Suit was filed by the plaintiff on October 17, 1962, more than one year after the date of July 28, 1961, the date on which the last of the invoices of plaintiff were dated prior to the next delivery of November 27, 1961."

The July 28, 1961 date has no significance at all. We quite agree with defendants that "there is no dispute that one hundred twenty three days elapsed between the separate invoices of July 28, 1961 and November 27, 1961." But neither is there any dispute that World War I began on July 28, or that Thanksgiving is sometimes celebrated on November 27. All those facts may have significance for certain purposes but they have none so far as this case is concerned.

It is perfectly clear that the invoices rendered between July 28 and November 27 were paid by Checks Nos. 5281, 5352, 5402, 5472, and 5503. It is also clear that all of the checks failed to pay for all the material furnished the project.

■ The $2,066.55 Sinclair claim is for all its unpaid invoices. The fact some of the invoices were for deliveries made before the July 27 date and some

---

2. We ruled that alleged defense was not available in fact or in law in our earlier memorandum opinion in this case reported in 233 F.Supp. 672.

after the November 28 date is totally without legal significance.

Defendants' reliance upon United States, for Use and Benefit of Edwards v. Peter Reiss Construction Co., 2 Cir. 1959, 273 F.2d 880, and United States, for Use and Benefit of General Elec. Co. v. Southern Construction Co., W.D.La. 1964, 229 F.Supp. 873, is misplaced. The former case pointed out that "we are not here required to decide whether, when a materialman makes deliveries under a series of purchase orders so that each delivery is within 90 days of its predecessor, a notice given within 90 days of the last order or delivery will relate back to include the entire chain" (273 F.2d at 881).[3]

An examination of the facts stipulated in Southern Construction, as they appear in the Judge Dawkins' first opinion in that case, reported in 229 F.Supp. 873, establish that this case is also distinguishable on the facts and that it dealt with a legal question not involved in this case.

The cases supporting the proposition that "Where materials are furnished to a subcontractor on an open account as ordered, with deliveries extending over a period in excess of 90 days, it has been held that a notice is timely with regard to all the materials furnished if it is given within 90 days after the last delivery," are collected under § 2b relating to "deliveries spread over more than 90 days" at page 416 of the annotation "Time of notice to public works contractor on United States Project under Miller Act", 78 A.L.R.2d 412.

Noland Company v. Allied Contractors, Incorporated, 4 Cir. 1959, 273 F.2d 917, pointed out that in that case, as is true in this case, "the real controversy between the parties centers on the fact that some of the deliveries of material were made more than ninety days prior to notice" (273 F.2d at 919). Such is the real basis of the defendants' argument in this case. Noland Company held that "if all the goods in a series of deliveries by the materialman to a subcontractor are used on the same government project, the notice is in time as to all the deliveries if it is given within ninety days from the last delivery" (273 F.2d at 920).

Such are the facts as we find them. We follow Noland Company and hold the notice in this case is timely for all deliveries and that Sinclair is entitled to recover $2,066.55. See also Judge Zavatt's excellent opinion in United States, for Use and Benefit of Edwards & Co. v. Bregman Construction Corp., E.D.N.Y. 1959, 172 F.Supp. 517, 522, for the "absurd results" that would attend a contrary holding. Compare United States, for Use and Benefit of Clark Concrete Constr. Corp. v. James Stewart Company, D.C.Idaho 1961, 195 F.Supp. 715.

Defendants make fleeting reference to the idea that "Sinclair has made no showing that it thought its diesel gasoline and other items were to be used and were being used on the Silberblatt job." What we said in regard to that argument in Russell is applicable. We so hold.

### III. *Order Directing Further Proceedings*

Prejudgment interest shall be included in both judgments for the reasons we stated at length in Triangle Electric Supply Co. v. Mojave Electric Co., W.D.Mo. 1965, 238 F.Supp. 815 at 818.

This memorandum opinion shall also serve as our findings of fact(s) and conclusions of law in each case. Should either party desire additional findings or conclusions they shall so indicate within five (5) days.

Counsel for plaintiff shall within ten (10) days prepare, submit to counsel for defendants for approval as to form, and

3. If Peter Reiss Construction Co. were not distinguishable on the facts, we could not follow it because of our controlling court's decision in United States, for Use and Benefit of General Elec. Co. v. Gunnar I. Johnson & Son, Inc., 8 Cir. 1962, 310 F.2d 899. The latter case, we believe, is in conflict with the rationale of the former.

present recommended forms of final judgment in both cases. The attention of counsel is directed to the fact that our determination of the question separated under Rule 42(b), as reported in 233 F.Supp. 672, shall be included in the final judgments to be entered in the two pending cases.

It is so ordered.